**2021 UT App 104**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
GERALD RADCKIFF GRANT,
Appellant.

Opinion
No. 20190621-CA
Filed September 30, 2021

Third District Court, Salt Lake Department
The Honorable Vernice S. Trease
No. 161902811

Sarah J. Carlquist and Rich Hawkes, Attorneys
for Appellant

Sean D. Reyes and Lindsey L. Wheeler, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES
GREGORY K. ORME and MICHELE M. CHRISTIANSEN FORSTER
concurred.

POHLMAN, Judge:

¶1     Under the pretense that he would be buying drugs, Gerald Radckiff Grant got into an SUV with three men. The SUV drove off, and when Grant exited the parked SUV minutes later, all three men had fatal gunshot wounds. Grant, claiming he acted in imperfect self-defense, pleaded guilty to three counts of manslaughter for causing the deaths of the three men. In addition to sentencing Grant to prison, the district court ordered him to pay restitution.

¶2     Grant appeals the restitution order, asserting three errors. First, he argues that the district court should have allocated fault

to the victims. Second, he argues that the court plainly erred in ordering him to reimburse the victims' parents for income they lost in the aftermath of the killings. Third, he argues that the court erred in deferring the determination of court-ordered restitution to the Board of Pardons and Parole. We affirm in part, reverse in part, and remand.

BACKGROUND[1]

¶3     In the evening on February 18, 2016, police responded to a disturbance and found an SUV parked in the middle of the road. The police discovered three men with gunshot wounds in the vehicle—Mateo, Marcus, and Roman.[2] Mateo was pronounced dead on scene. Marcus and Roman, two brothers, were transported to the hospital, but within days they both died from their injuries.

¶4     Witnesses reported seeing a man exit the SUV and limp to the side of the road while talking on a cell phone. They said that a white car then arrived, the man got into the white car and it drove away. When the police searched the SUV, they found one .40 caliber casing and three 9mm casings. They recovered a .40 caliber Hi-Point pistol from under the front passenger seat. They also located a Ruger 9mm handgun in the yard of a nearby residence.

---

1. Because Grant pleaded guilty to three counts of manslaughter, there was no trial and so we recite the facts consistent with the district court's factual findings made in support of its restitution order. Like the parties, we also draw some background facts from the original and amended informations, as well as from the preliminary hearing transcript.

2. We use pseudonyms to protect the privacy of the victims and witnesses in this case.

¶5 Further investigation led the police to arrest Grant, who had gone to a hospital with a gunshot wound to his leg. The police interviewed Ali, the man who had brought Grant to the hospital. Ali said that he had arranged for Grant to buy marijuana and that Ali and another man, Samuel, had driven Grant in a white car to meet the sellers in the SUV. Ali reported that after Grant got into the SUV, they lost sight of it and that Grant called him a few minutes later saying he had been shot. Ali and Samuel then picked up Grant.

¶6 A subsequent search of cell phone communications showed that Grant had texted his girlfriend on February 18, 2016, describing "hit[ting] a lick on Cj" the night before.[3] Grant also told his girlfriend that he would meet her later that night but stated, "I might have to do some lick tonight but I'll let u know." Then at 7:30 p.m. he sent her a text saying that he was "leaving now." That same day, Grant also texted Ali, saying "we robbed Cj for a couple hundred" and asking Ali to set up another "plan" for later that night. Ali then set up the marijuana purchase with Mateo and forwarded the details to Grant via a screenshot. Ali followed up with a text to Grant to "bring the 9ner we got work now."[4]

¶7 The State initially charged Grant with three counts of aggravated murder, one count of aggravated robbery, and one count of obstructing justice. After a four-day preliminary hearing, the district court bound Grant over for trial on all charges. As a result of plea negotiations, the State amended the

---

3. In his declaration of probable cause, a detective stated that a "lick" and "work" are common terms used "in relation to" drug-related robberies.

4. The detective also explained that "9ner" can be understood as a 9mm gun, similar to the 9mm Ruger found near the scene.

information to charge Grant with three counts of manslaughter, with each count carrying an enhanced penalty for Grant's use of a dangerous weapon, and it dismissed the remaining counts. Grant pleaded guilty to the amended charges.

¶8 Grant's statement in support of his plea explains that he was pleading guilty to the elements of the crime as follows: "On or about February 18, 2016, in Salt Lake County, Mr. Grant caused the death of [Mateo], [Marcus,] and [Roman] while he reasonably but incorrectly believed that his conduct was legally justified or excused by self-defense. Mr. Grant used a firearm in the commission of the offense." Grant further acknowledged in the plea statement that he "may be ordered to make restitution to any victims of [his] crimes."

¶9 A presentence investigation report was completed before sentencing. In it, Grant provided his version of events. According to Grant, his friend set up the deal to buy marijuana from the three men, and Grant got in their SUV to weigh the drugs. The SUV suddenly took off "fast" and the man in the back seat "started to beat on" Grant, who fought back. The man in the front passenger seat leaned over the console to go through Grant's pockets and pressed a pistol into Grant's leg. Grant pulled out his own gun in response and, as he chambered a round, heard a shot and felt his leg become numb. Grant thought he "was going to die." He then shot the man next to him, making the man "scream[] and jump[] in the back cargo area," and Grant then saw the driver signal to the front passenger by running "his hand [a]cross his throat then point[ing] towards [Grant]." The front passenger and Grant then struggled until Grant shot him. The driver stopped the vehicle, and because Grant "didn't know what [the driver] was going to do," Grant "reached over and shot him too." Grant claimed that he learned only later that the front passenger's gun had jammed, and Grant concluded, "You bring a gun to a drug deal in case things go wrong, but you never plan on them going wrong."

¶10 At sentencing, the court ordered Grant to serve consecutive prison terms totaling not less than six years but not more than thirty years. The court also ordered Grant "to pay full restitution."

¶11 The State moved for restitution of at least $105,605.93. As pecuniary damages resulting from Grant's criminal activities, the State asserted that Marcus and Roman's parents should be compensated for the brothers' funeral expenses and income their father lost spending time arranging and attending funeral services. The State also claimed that Mateo's parents sustained pecuniary damages for funeral expenses, counseling expenses, and the income they lost during the period of mourning. Finally, the State claimed that the Utah Office of Recovery Services and Medicaid (ORS/Medicaid) should be reimbursed for around $67,000 in Medicaid benefits paid for the emergency health care provided to Marcus and Roman.[5]

¶12 Grant opposed the State's motion for restitution. He maintained that he acted in self-defense and argued that the district court should deny restitution or lower any amount of restitution by allocating fault to the deceased men. While admitting that he got in the SUV to purchase marijuana from the three men, Grant asserted that they intended to rob him and that the evidence would show that "the reason for Grant's shooting of the three men was that [Roman] drove the car away to avoid being followed by Grant's acquaintances, that [Mateo] attacked Grant, and finally, that [Marcus] trained his firearm on Grant and shot him." According to Grant, the conduct of the three men

---

5. The State also sought restitution for the property damage to the SUV and for Marcus and Roman's parents' loss of financial support that the brothers would have provided to them. The district court decided against awarding restitution for these claimed damages, and that decision is not at issue on appeal.

"broke the natural and continuous sequence in which the events were intended to originally unfold" and "no one would have been killed if the transaction had proceeded as planned." Grant further explained that the court would "have to determine from the available evidence whether Grant's recollection of what occurred inside [Roman's] vehicle" was consistent with the physical evidence and that "[t]hat determination [would] have to drive the allocation of fault."[6] Grant urged the court to "find that without the felonious actions of the deceased, their deaths would not have occurred and, consequently, they should not be entitled to any restitution."

¶13 The district court conducted an evidentiary restitution hearing. The court considered witness testimony and both parties' exhibits, as well as pleadings, memoranda, transcripts, the presentence investigation report, and all other relevant material on file. For example, the court noted that during Ali's police interview, he said Grant told him that Grant pulled his

---

6. Grant suggests on appeal that the factual basis of the plea limited the findings that the district court could make in determining restitution. But during oral arguments at the restitution hearing, the judge asked, "It sounds like one or both of you are going to ask me to go behind the plea and look at facts behind the plea to prove fault causation and things of that nature. And unless you stipulate to facts, the only place I can find facts and evidence are in the exhibits or in the testimony." The prosecutor stated, "Correct," and defense counsel said, "Right." In other words, both Grant and the State invited the court to make factual findings beyond the plea. *See generally State v. Marquina*, 2020 UT 66, ¶ 28, 478 P.3d 37 ("An error is invited when counsel encourages the trial court to make an erroneous ruling." (cleaned up)). Thus, we reject any argument by Grant that the facts on which the court could rely were limited to the factual basis of the plea.

gun first. The court also considered the medical examiner's report, which provided evidence of the location and positions of the victims when they were shot. The court deemed the medical examiner's report important to determining "who shot first" and found that the report supported the State's contention that Grant "pulled his gun first and shot first before he was shot in the knee."

¶14 The court noted that the parties agreed the Ruger 9mm pistol belonged to Grant, he had the Ruger with him on the night in question, and the Ruger was used to shoot the three men. The court also noted that the parties agreed that the .40 caliber Hi-Point pistol belonged to Marcus and was used to shoot Grant in the knee. The State's firearms expert concluded that the Hi-Point was fired once and then jammed immediately. The court also considered the report from the State's expert in shooting reconstruction, in which the expert agreed that the Hi-Point fired once and jammed and also concluded that "the sequence of the shots delivered, or who fired the first shot in the car, cannot be independently determined." The court nevertheless deemed the shooting reconstruction report important to determining what occurred in the vehicle and found that it, along with other evidence, contradicted Grant's version of events.

¶15 The district court found that the evidence supported the following sequence of events:

> [Grant] pulled his gun first, [and Mateo] was shot first while he was in the cargo area of the truck or in the process of moving to the cargo area. [Grant] was shot in the knee by [Marcus], [Grant] then shoots [Marcus] and lastly shoots [Roman in the head] while [Roman] was still in his seat belt in the driver seat.

¶16 Additionally, the district court considered the State's rule 404(b) evidence showing that Grant and others had planned and

carried out other drug robberies before the events in this case.[7] It found that the prior aggravated robberies "show planning and patterns very similar to the facts in this case." The pattern was as follows: Grant and others would contact dealers through a cell phone to set up fake purchases of marijuana with plans to rob the drug dealers. Grant would then go to the putative drug deals with a handgun, display the handgun, and rob the drug dealers of their drugs. The court found that Grant employed the same pattern in this case: Grant and Ali planned the robbery; Ali contacted the three men to set up the fake drug deal; Grant then took a gun to the robbery, displayed the gun first, and shot the three drug dealers.

¶17 In a detailed written order, the district court ruled that the State satisfied its burden to establish that Grant's criminal conduct was the proximate cause of the injury and deaths of Mateo, Marcus, and Roman. It concluded, moreover, that Grant's criminal conduct could be foreseen to cause injury to and the deaths of the three men.

¶18 The court further ruled that Grant's criminal conduct proximately caused pecuniary damages and that Mateo, Marcus, Roman, their parents, and ORS/Medicaid were crime victims entitled to restitution. First, the court found that Marcus and Roman's parents sustained pecuniary damages in the total amount of $18,536.44. That figure included the costs of their sons' funerals and the father's lost income. Second, the court found that Mateo's parents sustained $7,930.70 in pecuniary

---

7. Rule 404(b) of the Utah Rules of Evidence prohibits the admission of "[e]vidence of a crime, wrong, or other act . . . to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character," but the court may admit it for "another purpose," such as to prove intent, motive, or plan.

damages, which included funeral expenses, counseling expenses, and lost income. Third, it found that Marcus and Roman sustained serious injuries that resulted in death, and they incurred $67,138.79 ($21,428.45 for Roman and $45,710.34 for Marcus) in reasonable and necessary costs for ambulance and hospital services. ORS/Medicaid paid these expenses because Roman and Marcus were both Medicaid recipients. The court thus found that ORS/Medicaid sustained pecuniary damages in the total amount of $67,138.79.

¶19 On the issue of allocating fault, the district court rejected Grant's request to assign fault to Mateo, Marcus, and Roman. It concluded that Grant had "failed to prove that the victims' losses were caused in whole or in part by the victims' conduct." Instead, it assigned complete and total fault to Grant, finding that Grant's "conduct of planning and carrying out the aggravated robbery and eventual shooting [of] the victims was not broken or interrupted by any conduct by the victims" and that, in contrast, "[Marcus's] conduct, pulling out his gun, and eventually shooting [Grant] in the leg was in self-defense and defense of others." The court explained that credible evidence showed Grant "planned to commit an aggravated robbery of the victims and carried out his plan." Indeed, the court explained that the rule 404(b) evidence "supports the State's contention that the events in this case were part of a plan and [Grant's] motive and intent to do a 'lick' and to 'work' by stealing the marijuana from the victims without paying."

¶20 The court acknowledged that Grant pleaded guilty to three counts of manslaughter, reduced from first degree murder, for causing the deaths of the three men while he "reasonably but incorrectly believed that his conduct was legally justified or excused by self-defense." Yet the court was persuaded by the evidence that "Grant was there with his pistol and as part of a plan with the motive and intent to do a 'lick' and to commit an aggravated robbery." The court further decided that the

evidence, especially the shooting reconstruction report, showed that Grant pulled his gun first in an attempt to rob the three men, that Grant shot Mateo first while Mateo was attempting to move away from Grant by climbing into the rear cargo area, that Marcus subsequently shot Grant in his leg, and that Grant then shot and killed Marcus and Roman. The court concluded that the shooting reconstruction report "does not reliably show unlawful causative conduct on the part of [Marcus], [Mateo], or [Roman] and reaching another conclusion including that proposed by [Grant] would be speculative." Accordingly, the court assigned no comparative fault to Mateo, Marcus, and Roman, and it refused to reduce the pecuniary damages by some amount attributable to their comparative fault.

¶21 The court then determined complete restitution. *See* Utah Code Ann. § 77-38a-302(2)(a) (LexisNexis Supp. 2015) ("'Complete restitution' means restitution necessary to compensate a victim for all losses caused by the defendant."). For the specific pecuniary damages discussed above, *supra* ¶ 18, the court decided that Grant owed complete restitution in the total principal amounts of $7,930.70 in favor of Mateo's parents, $18,536.44 in favor of Marcus and Roman's parents, and $67,138.79 in favor of ORS/Medicaid.

¶22 Lastly, the district court decided that the Utah Board of Pardons and Parole (the Board) would determine court-ordered restitution.[8] *See generally id.* § 77-38a-302(2)(b) ("'Court-ordered restitution' means the restitution the court having criminal jurisdiction orders the defendant to pay as a part of the criminal sentence . . . ."). It reasoned that because Grant's sentence included a commitment to the Utah State Prison, the Board—not

---

8. The parties dispute which version of the Utah Code the court applied in making its decision regarding court-ordered restitution. *See infra* note 15.

the court—would "be better able to assess [Grant's] ability to pay court-ordered restitution as [Grant] serves prison time and at the time when payments will commence during parole, if [Grant] is granted parole." The court entered its restitution order and judgment.

ISSUES AND STANDARDS OF REVIEW

¶23  Grant now appeals the restitution order, raising three issues for our consideration. First, he argues that for purposes of restitution, the district court should have allocated fault to the deceased because their own conduct contributed to the cause of their deaths. Second, Grant argues that the court plainly erred when it awarded restitution to the victims' parents for their own lost income. Third, Grant argues that the court erred when it declined to determine court-ordered restitution.

¶24  "We will not disturb a district court's restitution determination unless the court exceeds the authority prescribed by law or abuses its discretion." *State v. Ogden*, 2018 UT 8, ¶ 25, 416 P.3d 1132 (cleaned up). A district court abuses its discretion "only if it can be said that no reasonable person would take the view adopted by the trial court." *State v. Bird*, 2017 UT App 147, ¶ 14, 405 P.3d 726 (cleaned up). "To the extent that the district court made legal determinations in connection with its restitution analysis, we review those legal determinations for correctness." *State v. Oliver*, 2018 UT App 101, ¶ 15, 427 P.3d 495 (cleaned up); *see also Ogden*, 2018 UT 8, ¶ 24 ("We review questions of statutory interpretation for correctness."); *accord State v. Hedgcock*, 2019 UT App 93, ¶ 11, 443 P.3d 1288. We review the district court's findings of fact for clear error. *See State v. Chadwick*, 2021 UT App 40, ¶ 6, 486 P.3d 90 ("When a defendant argues that the evidence was insufficient to support a restitution order, the defendant must demonstrate that the clear weight of the evidence contradicts the court's ruling." (cleaned up)).

ANALYSIS

## I. Allocation of Fault

¶25   Grant first contends that the district court erred "when it refused to allocate any fault to the deceased in determining complete restitution." According to Grant, "all three of the deceased willingly participated in a drug deal where they lost their lives," and "it simply cannot be the case that three drug dealers . . . shot and killed in the course of a nefarious drug deal bear no fault whatsoever in the cause of their own deaths." (Cleaned up.) The State responds that the court properly allocated all fault to Grant because "[n]one of the victims' actions during the shooting contributed to their deaths."

¶26   We begin with a discussion of the various legal principles that intersect in this case. We then address Grant's fault arguments on appeal.

A

¶27   As a preliminary matter, we must address whether comparative fault principles apply to restitution proceedings. Before the district court, the parties agreed that they do. And on appeal, the State urges us to assume that comparative fault principles apply in this case based on that agreement. We accept the parties' agreement, and thus we assume, without deciding, that comparative fault principles apply to restitution proceedings.[9]

_____

9. We believe that resolving this legal question would be difficult. In *State v. Laycock*, 2009 UT 53, 214 P.3d 104, a negligent homicide case, the Utah Supreme Court held that "issues of comparative negligence may be relevant in determining restitution," adding that "[a] trial judge cannot decline to
(continued…)

¶28 The Crime Victims Restitution Act (the Act) provides that "[w]hen a defendant is convicted of criminal activity that has resulted in pecuniary damages, in addition to any other sentence it may impose, the court shall order that the defendant make restitution to victims of crime as provided in [the Act], or for conduct for which the defendant has agreed to make restitution as part of a plea disposition." Utah Code Ann. § 77-38a-302(1) (LexisNexis Supp. 2015).[10] "'Pecuniary damages,'" in turn, "means all demonstrable economic injury, whether or not yet incurred, which a person could recover in a civil action arising out of the facts or events constituting the defendant's criminal

---

(…continued)

consider evidence that a victim's losses were caused, not by a defendant, but by the victim's own negligence, or indeed the negligence of some other person in its determination of *complete restitution*." *Id.* ¶ 27 & n.4. Yet when the supreme court held in *Graves v. North Eastern Services, Inc.*, 2015 UT 28, 345 P.3d 619, that "the statutory principle of apportionment for 'fault' extends to cases involving intentional torts," *id.* ¶ 75, it suggested that it might be "impossible to conceptualize the notion of apportioning liability to the 'negligence' of a victim of an intentional tort—in not taking adequate measures to protect herself from an assault," stating that it would "expect a jury to reject this notion out of hand," *id.* ¶ 71 n.10 (cleaned up). The court further suggested that this "notion of apportionment may be a true 'absurdity'" even if it is compatible with the statutory text of the Liability Reform Act. *Id.* This same conceptual problem might present itself when, as here, considering the negligence or fault of a victim of an intentional criminal act. In any event, we need not and do not resolve the matter in this case.

10. The parties agree that the 2015 version of the Utah Code applies to this issue.

activities and includes the fair market value of property taken, destroyed, broken, or otherwise harmed, and losses including lost earnings and medical expenses, but excludes punitive or exemplary damages and pain and suffering." *Id.* § 77-38a-102(6). "'Criminal activities' means any offense of which the defendant is convicted or any other criminal conduct for which the defendant admits responsibility to the sentencing court with or without an admission of committing the criminal conduct." *Id.* § 77-38a-102(2). And "[f]or the purpose of determining restitution for an offense, the offense shall include any criminal conduct admitted by the defendant to the sentencing court or to which the defendant agrees to pay restitution." *Id.* § 77-38a-302(5)(a).

¶29    In assessing whether there is a causal connection between the crime and the pecuniary damages required by the Act, "the same proximate cause standard ordinarily applied in civil cases" is applied in the restitution context. *State v. Oliver*, 2018 UT App 101, ¶ 20, 427 P.3d 495 (cleaned up); *see also State v. Ogden*, 2018 UT 8, ¶ 48, 416 P.3d 1132. And for proximate cause to exist, two elements must be proven: "First, but-for causation must be present; indeed, proximate cause is that cause which, in a natural and continuous sequence, unbroken by any new cause, produced the injury, and without which the injury would not have occurred." *Oliver*, 2018 UT App 101, ¶ 21 (cleaned up). "Second, the harm must be foreseeable." *Id.* "Proximate cause requires some greater level of connection between the act and the injury than mere 'but for' causation." *Id.* (cleaned up); *see also Raab v. Utah Ry. Co.*, 2009 UT 61, ¶ 23, 221 P.3d 219. The "focus[]" of the proximate cause inquiry is "whether liability should attach to a particular cause in fact." *Raab*, 2009 UT 61, ¶ 22.

¶30    The Liability Reform Act delineates the apportionment of comparative fault in civil actions. *See Biesele v. Mattena*, 2019 UT 30, ¶ 14, 449 P.3d 1; *Graves v. North E. Services, Inc.*, 2015 UT 28, ¶¶ 58–59, 345 P.3d 619; *see also* Utah Code Ann. §§ 78B-5-817

to -823 (LexisNexis 2018). It directs that the "fact finder may, and when requested by a party shall, allocate the percentage or proportion of fault attributable to each person seeking recovery, to each defendant, to any person immune from suit, and to any other [non-parties] . . . for whom there is a factual and legal basis to allocate fault." Utah Code Ann. § 78B-5-818(4)(a). "'Fault'" in this context "means any actionable breach of legal duty, act, or omission proximately causing or contributing to injury or damages sustained by a person seeking recovery," including, among other things, "negligence in all its degrees, comparative negligence, assumption of risk, [and] strict liability." *Id.* § 78B-5-817(2). This scheme allows an injured party to recover damages from "any defendant whose fault exceeds his own." *Hale v. Beckstead*, 2005 UT 24, ¶ 20, 116 P.3d 263; *see also* Utah Code Ann. § 78B-5-818(2) ("A person seeking recovery may recover from any defendant . . . whose fault . . . exceeds the fault of the person seeking recovery . . . ."). And the amount an injured party may recover "is proportionate to the percentage of fault attributed to the defendant." *Hale*, 2005 UT 24, ¶ 20; *see also* Utah Code Ann. § 78B-5-820(1) (stating that "the maximum amount for which a defendant may be liable to any person seeking recovery is that percentage or proportion of the damages equivalent to the percentage or proportion of fault attributed to that defendant"). The defendant bears the burden to prove that the person seeking recovery was at fault. *See Foster v. Steed*, 459 P.2d 1021, 1021 (Utah 1969).

¶31   To give our analysis additional context, we next set forth the self-defense principles that underlie the factual backdrop of this case. "Perfect self-defense is a complete defense to any crime" and "is available to one who reasonably believed that force was necessary to defend against unlawful force." *State v. Lee*, 2014 UT App 4, ¶ 36, 318 P.3d 1164 (Voros, J., concurring). Thus, a person generally "is justified in using force intended or likely to cause death or serious bodily injury only if the person reasonably believes that force is necessary to prevent death or

serious bodily injury to the person or a third person as a result of another person's imminent use of unlawful force, or to prevent the commission of a forcible felony." Utah Code Ann. § 76-2-402(1)(b) (LexisNexis 2017). But a person is not justified in using such force if the person "is attempting to commit, committing, or fleeing after the commission or attempted commission of a felony." *Id.* § 76-2-402(2)(a)(ii).

¶32    Imperfect self-defense "is a partial defense," which reduces a charge of murder to manslaughter. *Lee*, 2014 UT App 4, ¶ 37 (Voros, J., concurring); *see also State v. Bonds*, 2019 UT App 156, ¶ 44, 450 P.3d 120, *cert. granted*, 466 P.3d 1072 (Utah 2020). "It is available to one who reasonably *but incorrectly* believed that his use of lethal force was legally justified . . . ." *Lee*, 2014 UT App 4, ¶ 37 (Voros, J., concurring); *see also* Utah Code Ann. § 76-5-203(4) (LexisNexis 2017). In other words, if, under the facts as the defendant believed them to be, the defendant "reasonably but incorrectly believed his actions were legally justifiable, he acted in imperfect self-defense." *Lee*, 2014 UT App 4, ¶ 38 (Voros, J., concurring).

¶33    As Grant views the facts of this case, he acted in either perfect or imperfect self-defense. He also recognizes that perfect self-defense may not have been available to him because in trying to purchase drugs, he may have been in the midst of committing a felony, depending on the type and quantity of the drug involved. This acknowledgment accords with his statement in support of the plea that he "caused the death of [Mateo], [Marcus,] and [Roman] while he reasonably but incorrectly believed that his conduct was legally justified or excused by self-defense."

¶34    For restitution purposes, however, the district court did not share Grant's view of the facts. Rather, it found that other

evidence contradicted Grant's claims, specifically that Grant planned to rob the three men,[11] that Grant pulled his gun first, and that it was Marcus who acted in self-defense and defense of others. And based on those findings, the court rejected Grant's contention that the three men proximately caused or contributed to their own deaths.

B

¶35 Grant argues on appeal that the district court erred when it refused to allocate fault to Mateo, Marcus, and Roman. Though he does not directly challenge the court's underlying factual findings, Grant asserts that he should not be 100% at fault when the court's factual findings are that "the deceased arranged, participated in, and brought at least one dangerous weapon to an illegal drug deal." He also claims that the court's decision was "based on the misunderstanding that Grant's plea rendered him 100% at fault as a matter of law." The parties agree that apportionment of fault constitutes a question of fact that this court reviews for clear error. We address the comparative fault of each of the deceased individually. We then address Grant's argument about the district court's consideration of his plea.

1

¶36 Grant asserts that the "clear weight of the evidence shows that [Mateo] bore some level [of] fault for his death, as well as in the deaths of [Roman] and [Marcus]." "Even though the district court found Grant and [Ali] had arranged a 'fake drug deal' as a pretext to commit a drug robbery," Grant argues, "that fact does not absolve [Mateo] of fault because he also [undisputedly] arranged the drug deal that led to his death."

---

11. Grant maintains that he did not arrange the drug deal as a pretext to commit a drug robbery.

¶37 As discussed, to allocate fault to Mateo, Grant had to show that Mateo's conduct proximately caused or contributed to his own death or the deaths of Marcus and Roman. *See Ogden*, 2018 UT 8, ¶ 48. In other words, Grant had to prove that Mateo's conduct produced the harm or set in motion events that produced the harm in a natural and continuous sequence. *See Oliver*, 2018 UT App 101, ¶ 21. Further, Grant had to prove that Mateo's death was foreseeable. *See id.* Grant has not met his burden.

¶38 Grant argues that because Mateo "arranged the drug deal" with Grant, he must necessarily bear some fault for his own death. Grant asserts that "it simply cannot be the case that" a drug dealer, "killed in the course of the drug-deal in which [he] willingly participated," is not at least partially at fault for being shot and killed in a robbery attempt. That is the extent of Grant's proximate cause analysis. Grant thus asks us to conclude that merely because Mateo arranged a drug deal, he is at least partially responsible for his own death and that the district court was obligated to apportion some fault to him. But Grant neglects to analyze the issue under the proximate cause standard, and he cites no case law to support the proposition that some fault *must* be apportioned to Mateo under these circumstances.[12]

_____

12. In support of his position, Grant cites *Cabrera v. Hirth*, 779 N.Y.S.2d 471 (App. Div. 2004), and *Hutcherson v. City of Phoenix*, 961 P.2d 449 (Ariz. 1998) (en banc), *overruled on other grounds by State v. Fischer*, 392 P.3d 488 (Ariz. 2017). But these cases stand only for the proposition that fault was appropriately apportioned to a third party in cases involving murder and assault. *See Cabrera*, 779 N.Y.S.2d at 472; *Hutcherson*, 961 P.2d at 451–54. They do not establish that a victim must be apportioned fault in the victim's own death, even when the victim willingly participated in an illegal transaction.

¶39    Moreover, the court's decision that Grant bore all fault for the deceased's deaths is supported by the evidence: text messages showed that Grant was planning to "do some lick," i.e., a drug robbery; the rule 404(b) evidence showed that Grant had a pattern of planning and carrying out similar drug robberies, *see supra* ¶ 16; and Ali told police that Grant admitted to pulling his gun first, *see supra* ¶ 13. The medical examiner's report and the shooting reconstruction report also undermined Grant's version of events. We thus disagree that the clear weight of the evidence demanded apportioning fault to Mateo. To the contrary, the court found that the "forensic report does not reliably show unlawful causative conduct on the part of [Marcus], [Mateo], or [Roman] and reaching another conclusion including that proposed by [Grant] would be speculative." We therefore will not reverse the district court's decision declining to allocate any fault to Mateo.

2

¶40    Likewise, Grant asserts that the clear weight of the evidence shows that Marcus "bore some level [of] fault for his death, as well as for the deaths of [Mateo] and [Roman]." In support, Grant stresses that Marcus brought the .40 caliber Hi-Point pistol and used it in the drug deal. Grant also asserts that he shot Marcus "as a direct result of [Marcus] shooting him" and that he "could not have known that [Marcus's] pistol jammed after firing the single shot that struck Grant in the leg."

¶41    Again, Grant has not analyzed this issue under the proximate cause standard, and he cites no authority to support his argument that some fault *must* be apportioned to Marcus. Although Marcus brought a pistol to the drug deal, the district court found that Grant pulled his gun first and shot Mateo, who was moving away from Grant and into the cargo area, and that Marcus pulled his gun and shot Grant only *after* Grant shot Mateo. These findings were supported by evidence, and because

evidence showed that Marcus acted only in response to Grant's shooting, we cannot say that the district court erred in refusing to apportion fault to Marcus.

### 3

¶42    Grant asserts that the "clear weight of the evidence shows that [Roman] bore some level of fault for his death, as well as for the deaths of [Mateo] and [Marcus]," based on the undisputed fact "that [Roman] drove himself, [Marcus], and [Mateo] to the drug deal." Grant further points to evidence that "[Roman] was a willing participant in a drug deal, . . . drug paraphernalia was found near the driver's seat, and he brought brass knuckles to the drug deal" after telling a friend that he intended to "roll up with [Mateo]" and "bust a lick."

¶43    As with Mateo, Grant has not shown that Roman's mere agreement to participate in a drug deal contributed to or proximately caused Roman's own death. Grant's suggestion that Roman's act of "absconding from the pre-arranged drug-deal location . . . likely contributed, at least in part," to the deaths rests on speculation. Further, the evidence showed that Grant shot Roman in the back of the head while Roman remained in the driver seat. And although brass knuckles were found under the driver's seat, Grant has not shown that he was even aware of the brass knuckles or that they played a role in the shootings. Finally, as the State points out, the district court did not appear to credit the friend's testimony that Roman planned to "[b]ust a lick." Rather, the court found that Grant was the one who planned and carried out a robbery. Under these circumstances, we will not set aside the district court's refusal to apportion fault to Roman.

### 4

¶44    Grant next challenges the court's allocation finding to the extent it appears to be "based on the misunderstanding that

Grant's plea rendered him 100% at fault as a matter of law." In other words, Grant argues that "the district court appears to have concluded that by pleading guilty to manslaughter, no fault could be apportioned to the victims as a matter of law." In so arguing, he contends that the court committed legal error by "allocat[ing] all fault to Grant on the basis of his plea alone."

¶45 We disagree with this underlying premise, and we instead agree with the State that the district court "relied on the totality of the evidence, not solely on [Grant's] pleas, when it allocated fault." Granted, the court made statements at the restitution hearing expressing doubt about whether it needed to "relitigate all the issues related to fault" when "[s]omebody in this room has already accepted fault for something." Yet the court's detailed findings of fact and conclusions of law show that the court based its decision on the totality of the evidence submitted to the court and not just the fact of Grant's plea. Indeed, the court stated that it reviewed "all relevant parts of the record including the parties' pleadings, memoranda, exhibits, transcripts, the testimony of witnesses and crime victims, the presentence report, and all other relevant materials on file." Because the court's decision did not rest on the basis of Grant's plea alone, we do not agree with Grant that the court decided the issue as a matter of law.

¶46 In summary, we conclude that the court's decision to allocate all fault to Grant is supported by evidence and did not constitute an abuse of discretion.

## II. The Victims' Parents' Lost Income

¶47 Next, Grant argues that the district court erred when it awarded complete restitution to the victims' parents for their own lost income. Because there are no allegations that Grant's criminal activities resulted in bodily injury to the deceased's parents, Grant asserts that their lost income cannot be recovered under the applicable statute. Grant recognizes that this issue is

unpreserved, and he therefore asks us to review it under the plain error exception to the preservation rule.

¶48 "To demonstrate plain error, a defendant must establish that (i) an error exists; (ii) the error should have been obvious to the district court; and (iii) the error is harmful." *State v. Hedgcock*, 2019 UT App 93, ¶ 11, 443 P.3d 1288 (cleaned up). "For an error to be obvious the law governing the error must be clear or plainly settled at the time the alleged error was made." *Id.* ¶ 15 (cleaned up). "If any one of [the three] requirements is not met, plain error is not established." *State v. Johnson*, 2017 UT 76, ¶ 20, 416 P.3d 443 (cleaned up).

¶49 Under the applicable statute, the court, in determining complete restitution, could consider "the income lost by the victim as a result of the offense if the offense resulted in bodily injury to a victim." Utah Code Ann. § 77-38a-302(5)(b)(iv) (LexisNexis Supp. 2015);[13] *see also id.* § 77-38a-102(14)(a) ("'Victim' means any person or entity, including the Utah Office of Victims of Crime, who the court determines has suffered pecuniary damages as a result of the defendant's criminal activities."). The supreme court has interpreted this statute to mean that "lost income is available as a component of complete restitution only 'if the offense' in question 'resulted in bodily injury to a victim.'" *State v. Wadsworth*, 2017 UT 20, ¶ 4, 393 P.3d 338 (quoting Utah Code § 77-38a-302(5)(b)(iv) (2012)). For instance, in *Wadsworth*, the defendant's sex "crimes led to the victim's depression, which required counseling and impacted her ability to work," *id.* ¶ 2, but the supreme court held that because "there was no allegation that [the defendant's] offense 'resulted in bodily injury' to the victim," complete restitution could not include the victim's lost income, *id.* ¶ 11.

---

13. The parties agree that the 2015 version of the Utah Code applies to this issue.

¶50    Grant contends that like the victim in *Wadsworth*, "the deceased's parents constitute . . . victims . . . , but none of them suffered bodily injury as a result of Grant's conduct." Rather, the deceased's parents suffered only "emotional injury" and therefore could not recover lost income. And because *Wadsworth* was issued before the district court's restitution decision in this case, Grant argues, "it was obvious that lost income was not recoverable."

¶51    The State, in contrast, defends the district court's decision, arguing that the statute "does not limit lost-wages restitution to the victim who suffered bodily injury." According to the State, the applicable statute requires "that 'a victim' suffer bodily injury as a result of the offense." (Quoting the 2015 version of Utah Code section 77-38a-302(5)(b)(iv).) And because Grant's offenses resulted in bodily injury—death—to Mateo, Roman, and Marcus (all victims), the statute's requirement was satisfied and the lost income that the deceased's parents incurred, as a result of Grant's offenses, could be included as restitution. The State also distinguishes *Wadsworth*, pointing out that the defendant's crimes there did not cause bodily injury to any victim. The State further asserts that *Wadsworth* did not resolve "whether the restitution victim herself must suffer bodily injury to qualify for lost-wages restitution."

¶52    We conclude that any error in including the lost income of the deceased's parents in complete restitution would not have been obvious to the district court. First, the controlling statute's plain language lends some support to each side's position. *See State v. Laycock*, 2009 UT 53, ¶ 19, 214 P.3d 104 ("When examining a statute, we first look to its plain language."). It states that the court could consider "the income lost by *the* victim as a result of the offense if the offense resulted in bodily injury to *a* victim." Utah Code Ann. § 77-38a-302(5)(b)(iv) (emphases added). The use of the word "the" before the word "victim" could be read as "a word of limitation as opposed to indefinite

or generalizing force [of] 'a' or 'an.'" *See State v. Gonzales*, 2000 UT App 136, ¶ 28, 2 P.3d 954 (Davis, J., concurring in the result) (cleaned up). Thus, "the income lost by *the* victim" could be read to refer to the specific victim who suffered bodily injury, thereby limiting lost-income restitution to that victim. *See* Utah Code Ann. § 77-38a-302(5)(b)(iv) (emphasis added). On the other hand, the statute also refers to "bodily injury to *a* victim," *id.* (emphasis added), and because the "indefinite article 'a' can mean 'any,'" *Graphic Packaging Int'l Inc. v. Labor Comm'n*, 2021 UT App 82, ¶ 24 (cleaned up), *petition for cert. filed*, Aug. 20, 2021 (No. 20210573), the statute could be read to make lost-income restitution available when *any* victim suffered bodily injury, *see* Utah Code Ann. § 77-38a-302(5)(b)(iv). The statute's language therefore is "not sufficiently clear" to resolve the question of whether the restitution victims themselves must suffer bodily injury to become eligible for lost-income restitution. *See State v. Dean*, 2004 UT 63, ¶¶ 18, 21, 95 P.3d 276 (stating that "the law in this area was not sufficiently clear or plainly settled" when determining that an error was not obvious).

¶53    Second, *Wadsworth* does not address the question before us. Rather, the supreme court in *Wadsworth* focused on the "*if* clause" of the statute, concluding that it "sets an exclusive limit on the availability of restitution for lost income." 2017 UT 20, ¶¶ 2, 4. Indeed, *Wadsworth* held "that lost income is available as a component of complete restitution only 'if the offense' in question 'resulted in bodily injury to a victim.'" *Id.* ¶ 4 (quoting Utah Code § 77-38a-302(5)(b)(iv) (2012)). As a result, *Wadsworth* did not "plainly settle[]" the question in this case. *See Hedgcock*, 2019 UT App 93, ¶ 15 (cleaned up).

¶54    For these reasons, the controlling statute and *Wadsworth* did not provide "clear or plainly settled" law to guide the district court at the time the alleged error was made. *See id.* (cleaned up); *see also Dean*, 2004 UT 63, ¶ 21. We therefore cannot say that the alleged error should have been obvious to the

district court. *See Dean*, 2004 UT 63, ¶ 16. Accordingly, Grant's plain error claim regarding the victims' parents' lost income is unavailing.[14]

### III. Court-ordered Restitution

¶55    Finally, Grant contends that the district court erred "when it declined to determine court-ordered restitution." He argues that because the relevant statutes and case law required the district court to determine *both* complete restitution and court-ordered restitution, the court erroneously deferred the issue of court-ordered restitution to the Board. In response, the State asserts that the court's course of action was proper because, despite use of the term "court," "both the district court and the Board have the authority to order court-ordered restitution." In the State's view, "if a district court does not determine court-ordered restitution, the Board may." We agree with Grant.

¶56    Complete restitution and court-ordered restitution are distinct concepts. "Complete restitution is restitution necessary to compensate a victim for all losses caused by the defendant, taking into account all relevant facts," including those specified in Utah Code section 77-38a-302(5)(b). *State v. Mooers*, 2017 UT 36, ¶ 9, 424 P.3d 1 (cleaned up). In contrast, court-ordered restitution "is the restitution the court having criminal jurisdiction orders the defendant to pay as a part of the criminal sentence." *Id.* ¶ 10 (cleaned up). "Unlike complete restitution, court-ordered restitution may be adjusted to take the defendant's ability to pay into account." *State v. Laycock*, 2009 UT 53, ¶ 30, 214 P.3d 104; *see also* Utah Code Ann. § 77-38a-302(5)(c) (LexisNexis 2017) (listing the factors that a court shall consider in

---

14. Because we conclude that Grant has not shown that the alleged error was obvious, we have no occasion to decide the correct reading of the applicable statute.

"determining the monetary sum and other conditions for court-ordered restitution"); *State v. Ogden*, 2018 UT 8, ¶ 28, 416 P.3d 1132 (explaining that court-ordered restitution takes into consideration "the defendant's financial resources, other obligations, the rehabilitative effect, and other circumstances" (cleaned up)). "In other words, court-ordered restitution is a subset of complete restitution that, among other things, takes into account the defendant's circumstances." *Mooers*, 2017 UT 36, ¶ 11 (cleaned up).

¶57    Utah Code section 77-38a-302 states that in determining restitution, "the court shall determine complete restitution and court-ordered restitution." Utah Code Ann. § 77-38a-302(2) (LexisNexis 2017).[15] This plain language of Utah Code section 77-38a-302(2)(a)–(b) is "a clear directive that district courts are to make two separate restitution determinations, one for complete restitution and a second for court-ordered restitution." *Laycock*,

---

15. The parties dispute which version of the Utah Code the district court applied in making its decision to defer the court-ordered restitution determination. Grant asserts that the 2015 version applied whereas the State asserts that it was the 2017 version. We cite the 2017 version because the relevant portion of the court's decision cited 2017 as the year of the applicable statutes. But we also conclude that any differences between the two versions are immaterial. Most notably, Utah Code section 77-38a-302(2)'s language, which contains a "clear directive" according to our supreme court, *see State v. Laycock*, 2009 UT 53, ¶ 20, 214 P.3d 104, remained the same in 2015 and 2017, *compare* Utah Code Ann. § 77-38a-302(2) (LexisNexis Supp. 2015), *with id.* (2017). And the parties themselves agree that the result in this case is the same under both versions. As discussed, *infra* ¶ 60, even if we entertain the State's argument that certain 2017 provisions vindicate its position regarding the Board's authority, we still conclude that the State's argument is unavailing.

2009 UT 53, ¶ 20; *see also Ogden*, 2018 UT 8, ¶ 26 (same); *Mooers*, 2017 UT 36, ¶ 12 (emphasizing that "courts must make two separate determinations"); *State v. Hedgcock*, 2019 UT App 93, ¶ 13, 443 P.3d 1288 (explaining that failing to make the two separate determinations, "or even merging them into one order, is error" (cleaned up)).

¶58 We agree with Grant that the district court did not comply with this directive. While it did determine the amounts of complete restitution that Grant would potentially be required to pay to the deceased's parents and ORS/Medicaid, it declined to determine court-ordered restitution—the amount Grant would actually be required to pay—and "defer[red] the issue of court-ordered restitution to the [Board]." The court decided that because Grant was being committed to prison, "[t]he [Board], not the Court, will be better able to assess [Grant's] ability to pay court-ordered restitution as [Grant] serves prison time and at the time when payments will commence during parole, if [Grant] is granted parole." Even though the district court's view—that the Board would have better insight into Grant's ability to pay, especially when and if he is paroled—has logical merit, section 77-38a-302(2)(a)–(b) did not give the court the option to delegate the determination of court-ordered restitution to the Board. *See Laycock*, 2009 UT 53, ¶ 20; *see also Ogden*, 2018 UT 8, ¶ 26; *Mooers*, 2017 UT 36, ¶ 12.

¶59 In so deciding, the court appears to have relied on *State v. Ogden*, 2018 UT 8, 416 P.3d 1132, in which the Utah Supreme Court stated that the Act "requires a district court to 'determine' complete restitution, but gives it discretion with regard to the imposition of court-ordered restitution." *Id.* ¶ 42 (citing *Laycock*, 2009 UT 53, ¶ 23). The State agrees with the district court that this statement "grant[s] discretion on whether to order court-ordered restitution." But we agree with Grant that *Ogden*'s reliance on *Laycock* is better understood as a reference to the court's discretion over the amount of court-ordered restitution—

"it can be the same as complete restitution, it could be less, it could be nothing." *See Laycock*, 2009 UT 53, ¶ 23 ("Although the court must determine complete restitution, it is not required to order a defendant to pay complete restitution as part of the criminal sentence."); *id.* ¶¶ 27–29 (explaining that the court is "under no obligation to impose court-ordered restitution in an amount equal to complete restitution" and that "the imposition of court-ordered restitution is discretionary"). The district court must make *a* determination; the statute does not allow the district court to pass that determination off to the Board. *See Ogden*, 2018 UT 8, ¶ 26 (stating that the Act "requires the district court to calculate two types of restitution: complete restitution and court-ordered restitution" (citing Utah Code section 77-38a-302(2))). We therefore conclude that the court's reliance on the statement in *Ogden* was misplaced.

¶60    We also disagree with the State that the 2017 amendments to Utah Code section 77-38a-302 support the court's action. In particular, section 77-38a-302(5)(d) was revised to provide that if "the defendant is committed to prison . . . any pecuniary damages that have not been determined by the court within one year after sentencing may be determined by the Board." Utah Code Ann. § 77-38a-302(5)(d)(iii) (LexisNexis 2017). But we agree with Grant that the plain language of this provision allows the Board in this circumstance to determine "pecuniary damages," not "court-ordered restitution." *See Ogden*, 2018 UT 8, ¶ 43 ("The plain language of the [statute's] text provides the best evidence of legislative intent."); *accord Mooers*, 2017 UT 36, ¶ 7. This provision therefore does not alter the district court's obligation to determine both complete restitution and court-ordered restitution.[16]

_____

16. In support of its position, the State also relies on Utah Code sections 77-27-6 and 77-27-5. Section 77-27-6 states that the Board

(continued…)

¶61    Hence, we conclude that the district court erred when it deferred its court-ordered restitution determination to the Board. We thus remand this matter for the court to make that determination.

CONCLUSION

¶62    We first conclude that Grant has not established error in the district court's decision allocating all fault to him. We then conclude that the district court did not commit obvious error when it included the deceased's parents' lost income as part of complete restitution. We finally conclude that the district court erred when it declined to determine court-ordered restitution. Accordingly, we affirm in part, reverse in part, and remand for the district court to determine court-ordered restitution.

───────────

(…continued)

"may impose any court order for restitution," Utah Code Ann. § 77-27-6(2)(a) (LexisNexis 2017), and further explains, "In accordance with Subsection 77-38a-302(5)(d)(iii), the [B]oard may order that a defendant make restitution for pecuniary damages that were not determined by the court, unless the [B]oard applying the criteria as set forth in Section 77-38a-302 determines that restitution is inappropriate," *id.* § 77-27-6(2)(b); *see also id.* § 77-27-5(1)(e) (explaining that the Board "may determine restitution as provided in Section 77-27-6 and Subsection 77-38a-302(5)(d)(iii)"). The plain language of these provisions, however, allows the Board to order restitution only for "pecuniary damages that were not determined by the court," *id.* § 77-27-6(2)(b), and it does not suggest that the court can pass its obligation to determine court-ordered restitution to the Board.