2025 UT App 88

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
GLEN HOGUE,
Appellant.

Opinion
No. 20220544-CA
Filed June 12, 2025

Third District Court, Salt Lake Department
The Honorable Richard D. McKelvie
No. 211903653

Randall W. Richards, Attorney for Appellant

Derek E. Brown and Daniel W. Boyer,
Attorneys for Appellee

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES DAVID N. MORTENSEN and RYAN M. HARRIS
concurred.

CHRISTIANSEN FORSTER, Judge:

¶1 Glen Hogue challenges his convictions of manslaughter and felony discharge of a firearm. He raises arguments of insufficient evidence, prosecutorial misconduct, and ineffective assistance of trial counsel. We see no error related to the various issues raised by Hogue, and we therefore affirm.

## BACKGROUND

¶2 One evening in March 2021, Hogue and his friend Troy were hanging out together in Hogue's RV that was parked outside his house. The two smoked marijuana and drank whiskey

together. At some point, Troy tried to show Hogue his gun that he had brought over. The two men fumbled with the gun and accidentally fired one shot into the floor of the RV. Hogue was angry with Troy and began berating him for bringing the gun inside and yelling at him to sit down.

¶3 Another of Hogue's friends (Friend), who had been living in the RV during this period of time, was outside in his truck waiting for Troy to leave when he heard the gunshot. He approached the RV and could see Hogue and Troy yelling at each other. The two men exited the RV, still arguing, with Hogue holding the gun. Friend told Troy to leave, but Troy refused to leave without his gun. Troy also said he had two more guns in his truck and tried to get in his truck, but Hogue "shut the truck door." After "a couple of minutes arguing," the two men "appeared to calm down" and "went back inside the RV." Friend returned to his truck because he "did not want to be a part of it."

¶4 Back inside, Hogue, who still had Troy's gun, removed the gun magazine, which held three bullets, and removed an additional bullet from the chamber. He immediately thought that Troy "brought just exactly four bullets" because he intended to use them on Hogue, his girlfriend, his dog, and Friend. Hogue concluded that Troy "came to shoot."

¶5 While repeatedly apologizing, Troy asked Hogue to give him his gun back so he could leave. Hogue refused to return the gun, and he also took away Troy's truck keys. Hogue was afraid that Troy "was going to go down the street, come back and start shooting up the place." Hogue told Troy he would get him an Uber ride home and that he could come back the next day for his truck and gun.

¶6 During this period of time, Troy was sometimes "calm" and sometimes "really agitated and angry," even becoming "really belligerent at one point." Sometime during this time frame, Hogue decided to "reload[] the gun." Troy angrily told

Hogue, "Hey, just give me the gun and I'm going to leave." In response, Hogue "pointed [the gun] right at [Troy] and told him to sit down again at gunpoint with the bullet [in] the chamber."

¶7     Troy ultimately agreed to take an Uber ride home and moved toward the door to go outside and wait for the ride; Hogue moved to follow him out. Troy then reportedly "spun around and attacked" Hogue. In the attack, Hogue "pulled the trigger and shot [Troy] in the chest." This initial shot resulted in a "very devastating injury," tearing through "all of the great vessels of the heart"—an injury that would have left Troy "unresponsive within 30 seconds" and dead within minutes. However, Hogue claims that after Troy was shot, Troy came at him a second time, at which point the gun went off again and Troy fell to the floor. This time the bullet hit Troy in the cheek and exited the back of the neck—a "soft tissue injury" that did not impact bone or "any major vessels." Both bullet wounds were later described by the medical examiner as lacking the features typically present with a close-range or intermediate-range shooting, which "suggest[ed]" that "the gun was at least . . . two [feet] from where the entrance wound was"; however, the medical examiner was not able to definitively "rul[e] out" closer-range shots.

¶8     Friend heard the gunshots and came running. He found Hogue standing near Troy, who was on the floor of the RV and "breathing the death rattle." Hogue told Friend, "He made a run at me and I had to do it." But Friend later expressed confusion as to why Hogue would have felt a need to shoot Troy: "I don't get it. [Hogue] could have slapped [Troy] down so easy"—an apparent reference to the size disparity between the men, Hogue being 5'11" and Troy being 5'3".

¶9     Hogue left the RV and went into his house to call 911. He told his girlfriend, who had been in the house sleeping, "Call 911. We need an ambulance now." And when his girlfriend asked what was wrong, Hogue responded, "I shot Troy. He's hit."

Hogue's girlfriend called 911 and gave some initial information to the operator, and Hogue then took the phone and proceeded to give the operator additional information. Hogue told the operator that Troy had "tried to strike" him and explained, "I had to shoot him. . . . He was attacking me."

¶10 Hogue made similar statements to the police when officers arrived on the scene. To the first officer he encountered, Hogue stated, "He attacked me so I shot him." Then to another officer who asked what happened, Hogue simply said, "He attacked me." He elaborated, "I shot him in the chest and he was attacking me." The officer asked, "You killed him?" And Hogue replied, "Yes, I did."

¶11 When the paramedics on scene talked to Hogue and inquired as to whether he was hurt and whether he needed medical attention, he responded in the negative. Consistent with this self-assessment, pictures taken by police that night show no recent injuries on Hogue's head, arms, or hands. And the only blood discovered on Hogue or his clothing was a few drops on the top of one shoe.

¶12 Upon eventually arriving at the police station later that night, Hogue stated, "[J]ust letting you know I didn't do anything wrong, I'm defending myself and my girl and my house and everything." But shortly thereafter, he started to suggest that the gun had accidentally discharged as Troy had been attacking him:

> [H]e freaking hit me . . . swinging at me. The gun went off . . . . Because I was trying to stand up after he hit me the first time . . . . I was looking at him, he was standing back and he comes at me again, went off again.
>
> I don't know if I hit him. I think I hit him in the chest the first time. I wasn't aiming at him, just trying to stand up.

> Don't know where the second round went because he hit me, just fucking defend[ing] myself. I didn't do anything wrong. . . .
>
> Hope he's okay. I know I hit him because he was right on top of me. He stepped back a couple of steps and he came at me again.

¶13   When Hogue was interviewed by a detective later that night, he repeated much the same story. He explained that as Troy "came at" him, he "pulled the trigger"—"[n]ot consciously thinking of shooting [Troy] or anything." Hogue reported that he "stood up like [he] was going to . . . defend [him]self," that Troy "backed up for a minute" and then "came at [him] again," and that the gun "went off" once more.

¶14   The State charged Hogue with murder and with felony discharge of a firearm. At trial, the State supported its case with testimony from Friend, several involved law enforcement professionals, and the medical examiner. The State also presented numerous exhibits, including body camera recordings from officers that responded on the night of the shooting, the video recording of Hogue's interview at the police station, the audio recording of the 911 call, and audio recordings of several phone calls Hogue had made from jail. The defense, for its part, argued that Hogue had acted in self-defense and was therefore legally justified in shooting Troy.

¶15   After the presentation of evidence, Hogue moved for a directed verdict, arguing that "the State could not overcome the burden to prove beyond a reasonable doubt that [Hogue] did not act reasonably in self-defense." The trial court denied the motion. The jury was thereafter given instructions setting forth the elements for the charged crimes of murder and felony discharge of a firearm, additional instructions addressing the lesser included offenses of manslaughter and negligent homicide, as

well as instructions addressing the affirmative defenses of perfect self-defense and imperfect self-defense.

¶16    The jury found Hogue guilty of both murder and felony discharge of a firearm. However, because the jury also determined that the State had not disproven the applicability of imperfect self-defense, the jury's murder verdict resulted in the trial court entering a conviction for the reduced charge of manslaughter. Hogue was thereafter sentenced to concurrently running prison terms.

ISSUES AND STANDARDS OF REVIEW

¶17    First, Hogue argues that the State presented insufficient evidence at trial to support his convictions. "In assessing a claim of insufficiency of the evidence, we review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury." *State v. Gilliard*, 2020 UT App 7, ¶ 15, 457 P.3d 1128 (quotation simplified), *cert. denied*, 466 P.3d 1076 (Utah 2020). "And we will not reverse a jury verdict if we conclude that some evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt." *Id.* (quotation simplified).

¶18    Next, Hogue raises claims of prosecutorial misconduct. But prosecutorial misconduct is not "a standalone basis for independent judicial review." *State v. Hummel*, 2017 UT 19, ¶ 111, 393 P.3d 314. Rather, "when an appellant alleges prosecutorial misconduct, we review the trial court's ruling regarding the challenged conduct," *State v. Henfling*, 2020 UT App 129, ¶ 71, 474 P.3d 994, *cert. denied*, 481 P.3d 1040 (Utah 2021), and apply "our usual standards of review in [that] area," *Hummel*, 2017 UT 19, ¶ 112. "We review unpreserved prosecutorial misconduct issues under established exceptions to the law of preservation, if asserted by an appellant." *Henfling*, 2020 UT App 129, ¶ 71 (quotation simplified).

¶19 Finally, Hogue asserts that his trial counsel rendered constitutionally ineffective assistance in failing to present a different defense theory to the jury. "An ineffective assistance of counsel claim raised for the first time on appeal presents a question of law, which we review for correctness." *State v. Wyman*, 2013 UT App 93, ¶ 5, 300 P.3d 1285 (quotation simplified).

## ANALYSIS

### I. Sufficiency of the Evidence

¶20 Hogue argues that the evidence presented by the State at trial was insufficient to support his convictions. Specifically, he challenges the sufficiency of the evidence presented regarding the necessary mental states for the charged crimes. But we agree with the State that there was ample evidence supporting the mens rea elements here.[1]

---

1. The State also argues that this issue is conceptually different from the insufficient evidence argument raised below in Hogue's motion for a directed verdict and that, therefore, this argument was not preserved for appeal. *See State v. Centeno*, 2023 UT 22, ¶ 55, 537 P.3d 232 ("Where a party makes an objection at trial based on one ground, that objection does not preserve for appeal any alternative grounds for objection." (quotation simplified)); *State v. Bosquez*, 2012 UT App 89, ¶ 8, 275 P.3d 1032 ("[W]here a motion for a directed verdict makes general assertions but fails to assert the specific argument raised on appeal, the directed verdict motion itself is insufficient to preserve the more specific argument for appeal."). But because this issue is easily resolved in favor of the State, we elect to address it on the merits without addressing the preservation issue. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("[I]f the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we

(continued…)

¶21　As an initial matter, we address an incorrect assertion that Hogue builds upon in his appeal, that is, that he "was convicted of manslaughter under Utah Code [section] 76-5-205, for recklessly causing the death of Troy." This is a mistaken perception of the jury's determinations and the underlying statutory scheme upon which they were based.

¶22　The State charged Hogue with murder under Utah Code section 76-5-203. In addition to being instructed as to the elements of this murder charge, the jury was also instructed on the lesser included offenses of manslaughter, *see* Utah Code § 76-5-205, and negligent homicide, *see id.* § 76-5-206.[2] However, Hogue had also asserted the affirmative defenses of perfect self-defense and imperfect self-defense, and the jury was instructed that it was the State's burden to prove beyond a reasonable doubt that Hogue did not act in either perfect self-defense or imperfect self-defense. "Perfect self-defense is a complete defense to any crime," while "imperfect self-defense is a partial defense, which reduces a charge of murder to manslaughter." *State v. Grant*, 2021 UT App 104, ¶¶ 31–32, 499 P.3d 176 (quotation simplified), *cert. denied*, 505 P.3d 56 (Utah 2022); *see also* Utah Code § 76-2-402 (perfect self-defense); *id.* § 76-5-203(4) (imperfect self-defense).

¶23　The jury ultimately determined that the State had proven beyond a reasonable doubt the elements of the murder charge (and, necessarily, that the State had carried its burden to disprove perfect self-defense). But the jury also determined that the State

readily may opt to do so without addressing preservation." (emphasis omitted)).

2. Several of the Utah Code sections to which we cite have been amended in the years since the actions underlying Hogue's conviction. But because no such changes are relevant to the issues raised on appeal, we cite the current version of the statutes as a convenience to the reader.

had *not* met its burden to disprove that Hogue had acted in imperfect self-defense. Thus, notwithstanding that the jury found the elements of the murder charge satisfied, the jury's determination as to imperfect self-defense required the trial court to enter a conviction for the reduced charge of manslaughter. Therefore, it is simply incorrect, as Hogue asserts, that the jury found him guilty of manslaughter or determined that the elements of manslaughter (as opposed to murder) were met. Thus, any argument based on this mistaken framing fails, and we do not address it further.

¶24   We next consider whether the State submitted sufficient evidence to adequately support the mens rea elements that the jury actually found. We must affirm on this issue if "some evidence exists from which a reasonable jury could find that the elements of the crime[s] had been proven beyond a reasonable doubt." *State v. Gilliard*, 2020 UT App 7, ¶ 15, 457 P.3d 1128 (quotation simplified), *cert. denied*, 466 P.3d 1076 (Utah 2020). As it relates to the mens rea required to convict on the murder charge, there must have been evidence presented from which a reasonable jury could have found any one of the following: (1) that Hogue "intentionally or knowingly cause[d] the death of [Troy]"; (2) that Hogue "intend[ed] to cause serious bodily injury to [Troy]" and "commit[ted] an act clearly dangerous to human life that cause[d] the death of [Troy]"; (3) that Hogue, "acting under circumstances evidencing a depraved indifference to human life, . . . knowingly engage[d] in conduct that create[d] a grave risk of death to [Troy] and thereby cause[d] the death of [Troy]"; or (4) that Troy was killed "in the course of" Hogue committing the predicate offense of felony discharge of a firearm. *See* Utah Code § 76-5-203(2)(a)–(d). As to the felony discharge of a firearm mens rea, the State was required to show that Hogue intentionally, knowingly, or recklessly (1) "discharge[d] a firearm in the direction of [Troy], knowing or having reason to believe that [Troy] may be endangered by the discharge of the firearm" or (2) "discharge[d] a firearm in the direction of" Troy "with

intent to intimidate or harass" Troy. *See id.* § 76-11-210(2)(a)–(b); *see also id.* § 76-2-102 ("Every offense not involving strict liability shall require a culpable mental state, and when the definition of the offense does not specify a culpable mental state and the offense does not involve strict liability, intent, knowledge, or recklessness shall suffice to establish criminal responsibility."). And because Hogue was arguing perfect self-defense, a conviction on either of the charges required the State to also prove that Hogue did not reasonably believe that lethal force was "necessary to prevent death or serious bodily injury to [himself] or another individual as a result of imminent use of unlawful force, or to prevent the commission of a forcible felony." *Id.* § 76-2-402(2)(b). We determine that the mens rea evidence presented by the State was sufficient to support the jury's determination.

¶25 Directly after the shooting, Hogue made statements to both Friend and the 911 operator reflecting a belief that he "had to" shoot Troy because Troy had been attacking him. Similarly, Hogue's initial statement to responding officers expressed the same reasoning: "He attacked me so I shot him." Thus, there was evidence presented that could support a reasonable jury's conclusion that Hogue intentionally shot Troy—and, indeed, such a conclusion was essentially conceded by the defense in pursuing a self-defense theory at trial. And from this reasonable conclusion that Hogue intentionally shot Troy, a reasonable jury could determine that Hogue either (1) "intentionally or knowingly cause[d] the death of [Troy]" or (2) "intend[ed] to cause serious bodily injury to [Troy]" and "commit[ted] an act clearly dangerous to human life that cause[d] the death of [Troy]."[3] *See*

---

3. In passing, Hogue argues that because there was no evidence from which the jury could determine that the "intentionally or knowingly" murder mens rea was met, *see* Utah Code § 76-5-203(2)(a), it was plain error for the court to have included this language in the jury instructions. Considering our decision here

(continued…)

*id.* § 76-5-203(2)(a)–(b). Likewise, this evidence could also support a reasonable jury's determination that Troy was killed "in the course of" Hogue committing the predicate offense of felony discharge of a firearm, *see id.* § 76-5-203(2)(d), that is, that Troy was killed while Hogue knowingly or intentionally "discharge[d] a firearm in the direction of [Troy], knowing or having reason to believe that [Troy] may be endangered by the discharge of the firearm," *see id.* § 76-11-210(2)(a).

¶26 As to the self-defense argument, the jury heard various pieces of evidence that, together, could have reasonably disproved that Hogue acted in perfect self-defense. To start, Troy was unarmed during his alleged struggle with Hogue. And the jury was presented with Friend's assessment that Troy was not much of a threat to Hogue: "I don't get it. [Hogue] could have slapped [Troy] down so easy." All this seems in line with the fact that this alleged struggle left Hogue entirely uninjured. Further, the jury was presented with expert testimony that because the bullet wounds in Troy's body lacked the features typically present with a close-range or intermediate-range shooting, this "suggest[ed]" that Hogue fired the gun from at least two feet away, not that Troy was "on top of" him when Hogue fired, as Hogue had claimed. Additionally, the medical examiner testified that the first shot would have left Troy "unresponsive within 30 seconds" and dead within minutes, which undercuts Hogue's explanation of Troy "stepp[ing] back a couple of steps" and charging him a second time. Presented with this evidence, the jury could have reasonably concluded that Hogue's perfect self-defense argument was disproven because Hogue could not have reasonably believed that lethal force was "necessary to prevent

---

that there *was* evidence from which a jury could reasonably conclude that Hogue did intentionally or knowingly cause Troy's death, this related argument also necessarily fails.

death or serious bodily injury" under the circumstances here. *Id.* § 76-2-402(2)(b).

¶27   Hogue pushes back by asserting that "the evidence presented by the State was circumstantial at best." But "it is well established that intent can be proven by circumstantial evidence." *State v. Holgate*, 2000 UT 74, ¶ 21, 10 P.3d 346 (quotation simplified). Our review on appeal simply considers "(1) whether the State presented any evidence that [the defendant] possessed the requisite intent, and (2) whether the inferences that can be drawn from that evidence have a basis in logic and reasonable human experience sufficient to prove that [the defendant] possessed the requisite intent." *Id.* (quotation simplified). Both these requirements are met here.

¶28   And while Hogue argues that the State should have taken additional investigative steps, that the State should have produced additional evidence in making its case, and that the evidence that was submitted was consistent with alternative inferences more consistent with his defense, none of these assertions is relevant to the question before us. "The question presented is not whether we can conceive of alternative (innocent) inferences to draw from individual pieces of evidence, or even whether we would have reached the verdict embraced by the jury. It is simply whether the jury's verdict is reasonable in light of all of the evidence taken cumulatively, under a standard of review that yields deference to all reasonable inferences supporting the jury's verdict." *State v. Ashcraft*, 2015 UT 5, ¶ 24, 349 P.3d 664. And in considering the evidence presented in this case, we determine that this hurdle has been easily cleared, and we therefore affirm the jury's verdict.

## II. Prosecutorial Misconduct

¶29   Hogue generally argues that "the prosecutor relied on mischaracterizing incomplete and unreliable evidence to attain a

conviction."[4] *See State v. Allgood*, 2017 UT App 92, ¶ 24, 400 P.3d 1088 ("Prosecutorial misconduct occurs where the actions or remarks of the prosecutor call to the attention of the jury a matter it would not be justified in considering . . . ." (quotation simplified)), *cert. denied*, 406 P.3d 252 (Utah 2017). Within his argument on this point, Hogue points to only one specific action of the prosecutor: playing an abbreviated version of a jail phone call to the jury. However, Hogue did not preserve this issue for appeal by raising an objection below to the State's presentation of the partial recording.[5] *See State v. Hummel*, 2017 UT 19, ¶ 111, 393

---

4. The State argues that Hogue has presented several "nearly incomprehensible" arguments on appeal. While we have also had some trouble in deciphering certain arguments, we have made every effort to engage with each of the arguments presented in Hogue's briefing. To the extent that we have been unsuccessful in any aspect, we consider any such undeveloped arguments inadequately briefed for appeal. *See Fuller v. Springville City*, 2015 UT App 177, ¶ 19, 355 P.3d 1063 ("A brief must go beyond providing conclusory statements and fully identify, analyze, and cite its legal arguments. . . . If an appellant does not clearly identify and analyze the issues, we will not address them." (quotation simplified)).

5. We note that had Hogue believed that the abbreviated presentation of the phone call was unfair, he may well have been successful in requesting that a more complete recording be presented to the jury. *See* Utah R. Evid. 106 ("If a party introduces all or part of a statement, an adverse party may require the introduction, at that time, of any other part—or any other statement—that in fairness ought to be considered at the same time."). But without such a request, it was not the responsibility of the trial court to sua sponte require a lengthier version of the phone call recording to be played to the jury. *See State v. Hummel*, 2017 UT 19, ¶ 109, 393 P.3d 314 ("Our adversary system . . . relies

(continued…)

P.3d 314 (concluding, while addressing a prosecutorial misconduct argument, "that the law of preservation controls here as in other circumstances"). Nor does he argue that any exception to preservation applies here. *See generally id.* ("[A]bsent an objection at trial, we review the [trial] court's actions under established exceptions to the law of preservation . . . ."). Thus, we do not reach this particular claim.[6]

### III. Ineffective Assistance of Counsel

¶30 Hogue next raises an argument of ineffective assistance of counsel. Specifically, he asserts that because "the most likely and believable explanation" of what happened the night of the shooting is that "amongst the chaos the trigger was pulled

---

generally on objections from parties to police the admissibility of evidence. We do not require or even expect our trial judges to exercise their own independent judgment on the question of admissibility.").

6. In another section of his brief, Hogue labels a statement by the prosecutor during closing argument as prosecutorial misconduct. This issue would be preserved for appeal since Hogue lodged an objection to this statement before the trial court, arguing that the prosecutor's comments "misstat[ed] the record." However, in response to trial counsel's objection, the prosecutor immediately acknowledged that the objection was "[f]air," and the trial court seemingly agreed and promptly instructed the jury, "[I]n the event where either counsel's remarks in their closing arguments vary from what you believe the evidence is, you are to consider only the evidence as you recall it and not their comments." And on appeal, Hogue makes no attempt to develop this particular argument and explain why, as he summarily asserts, the court's response "did not appropriately address the objection." Therefore, we do not consider this argument further.

accidentally," his trial counsel performed deficiently by deciding "to rely entirely on an intentional action of self-defense."[7]

¶31 To prevail on an ineffective assistance of counsel claim, a defendant must make two showings. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). "First, the defendant must show that counsel's performance was deficient." *Id.* That is, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* "Second, the defendant must show that the deficient performance prejudiced the defense." *Id.* That is, the defendant must show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.*

¶32 Considering the first showing of deficient performance that Hogue must make, we recognize that "[t]here are countless ways to provide effective assistance in any given case." *Id.* at 689. Thus, in reviewing trial counsel's performance, we must "evaluate the conduct from counsel's perspective at the time" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* "The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (quotation simplified). Hogue has not done so here.

¶33 Trial counsel was confronted with forming a trial strategy in the face of the numerous inconsistent statements made by

---

7. Hogue's ineffective assistance of counsel argument additionally alleges that his trial counsel was ineffective by failing "to object to highly prejudicial remarks where the prosecution mischaracterized the evidence." However, Hogue points us to no specific mischaracterizations, and thus, we are unable to engage with this argument on appeal.

Hogue—specifically, several initial statements that Troy had been attacking him and he therefore "had to" shoot him, and several later statements that it was all an accident and he had not meant to shoot Troy. Thus, trial counsel had the option of pursuing two entirely inconsistent theories—that Hogue had intentionally shot Troy in self-defense or that Hogue had accidentally shot Troy amidst a scuffle. Certainly, trial counsel did not perform deficiently by choosing to not pursue both of these defenses, for, as this court has previously explained, "any election between inconsistent defenses is a legitimate exercise of trial strategy rather than ineffective assistance of counsel." *State v. Campos*, 2013 UT App 213, ¶ 34, 309 P.3d 1160 (quotation simplified), *cert. denied*, 320 P.3d 676 (Utah 2014). Nor are we convinced that the accidental-shooting theory was superior to the self-defense theory such that trial counsel's choosing to advance the self-defense theory—which had the potential for a complete acquittal as well as a reduced charge of manslaughter—could not be considered sound trial strategy. Thus, Hogue has failed to establish that his trial counsel performed deficiently in this regard, and his ineffective assistance of counsel claim fails.[8]

---

8. Hogue also makes a cumulative error argument. But since we have, in considering Hogue's appellate arguments, perceived no error on the part of the trial court and no deficient performance by trial counsel, there are no errors to accumulate and this argument is unavailing. *See State v. Wright*, 2013 UT App 142, ¶ 44, 304 P.3d 887 ("Under the cumulative error doctrine, appellate courts will reverse only if the cumulative effect of the several errors undermines our confidence that a fair trial was had. . . . If the claims are found on appeal to not constitute error, or the errors are found to be so minor as to result in no harm, the doctrine will not be applied." (quotation simplified)), *cert. denied*, 312 P.3d 619 (Utah 2013).

CONCLUSION

¶34    There was sufficient mens rea evidence presented at trial to support Hogue's ultimate convictions. Hogue's claims of prosecutorial misconduct were not preserved. And Hogue's claim of ineffective assistance of counsel fails because, on this record, trial counsel did not perform deficiently by pursuing a self-defense strategy to the exclusion of an inconsistent alternative theory. Affirmed.

_____