*This opinion is subject to revision before final publication in the Pacific Reporter*

**2026 UT 12**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

JORY ARLOW FENSTERMAKER,
*Appellant,*

*v.*

STATE OF UTAH,
*Appellee.*

No. 20210519
Heard January 28, 2026
Filed May 7, 2026*

On Direct Appeal

Second District Court, Davis County
The Honorable Robert J. Dale
No. 200700574

Attorneys:

Emily Adams, Freyja Johnson, Bountiful, for appellant

Derek E. Brown, Att'y Gen., Daniel L. Day, Asst. Solic. Gen.,
Salt Lake City, for appellee

JUSTICE NIELSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, JUSTICE PETERSEN, JUSTICE HAGEN, and
ASSOCIATE CHIEF JUSTICE POHLMAN joined.

---

* As of January 31, 2026, "The Supreme Court consists of seven justices." UTAH CODE § 78A-3-101(1). Pursuant to Utah Supreme Court Standing Order No. 18, this court sat and rendered judgment in this matter as a division of five justices.

JUSTICE NIELSEN, opinion of the Court:

## INTRODUCTION

¶1   Jory Fenstermaker shot and killed an unarmed Randy Lewis after a long evening of drinking and smoking marijuana. The State charged Fenstermaker with murder for the shooting and with felony firearm possession for having a gun while under the influence of marijuana.

¶2   Fenstermaker claimed that he acted in self-defense, but the self-defense statute at the time forbade a self-defense claim where the defendant was committing a felony. UTAH CODE § 76-2-402(2)(a)(ii) (2015).[1] The issues in this postconviction case center on how the trial court and Fenstermaker's trial and appellate counsel dealt with this proscription.

¶3   Fenstermaker's trial counsel argued that subsection 402(2)(a)(ii) should not apply because (1) unless "felony" was read to mean "forcible felony," the statute would produce an absurd result by prohibiting a minimally impaired person from arguing self-defense; and (2) prohibiting self-defense under these circumstances would violate the right to self-defense under the Utah Constitution. The trial court disagreed, rejecting the constitutional claim and ruling that "felony" meant "felony." It instructed the jury that a person committing a felony could not claim self-defense. The jury convicted Fenstermaker of both murder and felony firearm possession.

¶4   Fenstermaker appealed, and his appellate counsel argued that the trial court erred in giving the instruction. But appellate counsel did not argue prejudice from that error, claiming—wrongly—that it was a structural error for which a prejudice showing was unnecessary. The court of appeals affirmed on the basis that Fenstermaker had not argued or shown prejudice.

¶5   Fenstermaker then filed a petition for postconviction relief, claiming two things relevant here: (1) that his appellate counsel was ineffective for not arguing prejudice from the allegedly erroneous jury instruction; and (2) that his trial and appellate counsel were ineffective for not arguing that there had to be some

---

[1] The Legislature materially amended the statute after trial; we cite and apply the version in effect at the time of the shooting. *State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829 ("[W]e apply the law as it exists at the time of the event regulated by the law in question.").

connection between the felony being committed and the use of force to preclude self-defense. The postconviction court granted the State's motion for summary judgment on these claims, ruling that Fenstermaker could not show prejudice because evidence of his guilt was overwhelming. It alternatively ruled that counsel did not perform deficiently for various reasons. Fenstermaker timely appealed.

¶6   We affirm for lack of prejudice. Fenstermaker shot an unarmed man in the side, fled the scene, lied about his involvement, and had a prior conviction for lying to police. Under these and other relevant circumstances discussed below, there is not a reasonable likelihood of a more favorable result for Fenstermaker even if the jurors had been instructed as he wanted them to be.

## BACKGROUND[2]

¶7 One afternoon, Fenstermaker sent a "Snap"—the ephemeral unit of communication in the app Snapchat[3]—to his friend Andrea asking if she wanted to hang out. She said she did, but explained that Randy, the father of her three children, was in town from Missouri and staying with her. Fenstermaker said he did not mind, so Andrea picked him up. On the way to Andrea's house, they stopped at a fast-food restaurant for food and at a liquor store

---

[2] We recite the relevant undisputed material facts from the record evidence at trial and the parties' summary judgment filings in the postconviction case. The trial proceedings are deemed part of the record in a postconviction case challenging those proceedings. UTAH R. CIV. P. 65C(n)(3). And summary judgment is appropriate "when the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Newton v. State*, 2025 UT 50, ¶ 31, 585 P.3d 1159 (cleaned up). We recite the trial facts in the light most favorable to the verdict, discussing conflicting facts to the extent necessary to decide the issues on appeal—here, prejudice. *See McCloud v. State*, 2021 UT 51, ¶ 6 n.2, 496 P.3d 179.

[3] A Snap usually consists of a photo and some audio and/or text that disappears soon after the receiver opens it. *See* Snapchat Support, *How to Use Snapchat*, https://help.snapchat.com/hc/en-us/articles/7012332815508-How-to-Use-Snapchat (last visited Mar. 13, 2026).

to buy vodka and whiskey. When they got to Andrea's home, she introduced Fenstermaker to Randy and they all ate and began drinking in the kitchen. The conversation included discussion of Fenstermaker's recently purchased 9mm pistol, which he was carrying on him. Fenstermaker even allowed Randy to handle the gun. For a while, the two men got along famously, talking, laughing, and relating well to each other.

¶8 Later in the evening, Fenstermaker and Randy left to take one of Andrea and Randy's kids to a sleepover. At the sleepover house, Randy bought marijuana. Afterwards, Randy and Fenstermaker bought more liquor. When they got back to Andrea's house, the three adults smoked a "swisher"—a cigar that Fenstermaker had unrolled and replaced the tobacco inside with marijuana.[4]

¶9 Randy drank so much he got more intoxicated than Andrea had ever seen before—his speech was slurred and he repeatedly fell over. A later blood alcohol test showed him at a blood alcohol content of 0.19 (almost four times the legal limit for DUI), which was likely lower than it had been earlier in the evening.

¶10 While sitting at the kitchen bar several hours before the shooting, Randy and Fenstermaker started slap-boxing.[5] After a few slaps, they turned to tussling; Fenstermaker knocked Randy to the floor, then Randy flipped Fenstermaker onto his back. Fenstermaker then told Randy to get off, and they both sat back at the bar.

---

[4] Though Fenstermaker did not have any tetrahydrocannabinol, or THC (the active ingredient in marijuana), in his blood when it was tested almost a day later, he did have 6 nanograms of THC carboxy, which is a metabolite—that is, a biological byproduct—of THC. His own expert testified that it was "highly unlikely" that this amount came from "passive exposure." A photo Andrea took of Fenstermaker holding the swisher was also admitted into evidence.

[5] "Slapboxing (or slap-boxing) is a fighting sport like boxing, though competitors use open handed slaps instead of punching with their fists." *Slap Boxing*, TOPEND SPORTS, https://www.topendsports.com/sport/list/boxing-slap.htm (last visited Apr. 4, 2026). "It is typically performed as a display of skill and technique rather than as a serious competitive fight." *Id.*

¶11   Slapping and tussling notwithstanding, it appeared to Andrea that Randy and Fenstermaker got along quite well for "most of the night." But there was some tension; it seemed to her that Randy was acting jealous, which made Fenstermaker feel uncomfortable and intimidated. Fenstermaker agreed that things were all right for much of the night, but that he also felt uncomfortable; he claimed to have "played along" with drinking and slap-boxing to avoid making Randy mad.

¶12   And the drinking continued. By 11:30 p.m., Fenstermaker grabbed a knife from the kitchen sink and poked holes in beer cans for him (and possibly Randy) to "shotgun"—that is, to drink quickly from the puncture hole in the side of the can. Andrea said she returned the knife to the kitchen sink with all the other dirty dishes; Fenstermaker claimed he did not see her do this and that he thought the knife was still on the counter where he had left it.

¶13   Just after midnight, when Fenstermaker and Randy were still at the bar in the kitchen, Randy became "emotional," professing his love for Andrea and stating, "I'm the baby's dad, and I will always be number one." He also asked Fenstermaker about some money that had been stolen from Andrea by Fenstermaker's friends. Randy told Fenstermaker that he "better have [Andrea's] back, and not do [her] scandalous in any type of way." He said if he ever heard about Fenstermaker "doing anything," "or having anything to do with something bad that happened to" Andrea, "he would kill him, or he would beat his ass," a statement he repeated three times. Both Fenstermaker and Andrea agreed that the threats were future-based, at least at first.[6] They also agreed that after Randy spoke, or perhaps during the third threat, he "put his forehead against the side of [Fenstermaker's] head." Fenstermaker claimed that Randy whispered in his ear an unconditional "I'm going to kill you."

¶14   At that point, Fenstermaker had enough. Just after Randy leaned his head close to Fenstermaker's, Fenstermaker stood, "pulled the gun out from his pants," and backed away toward the

---

[6] Fenstermaker testified that the first "I'll kill you" was conditional ("You need to have my baby mama's back or I'll kill you.") but that the second and third threats were both an unconditional "I'm going to kill you." Andrea testified that each of the three threats were "future-wise," and that each was the same "I'll kill you or beat your ass."

front door. Randy was still seated and may have "put his hands up," either smirking or looking confused. Fenstermaker admitted that Randy was seated and unarmed when he pulled the gun. He also testified that he was backing towards the front door and was pointing the gun at a down angle, which he had been taught to do in his concealed-carry class when trying to retreat.

¶15 Andrea said that Fenstermaker was pointing the gun at Randy. She tried to diffuse the situation, putting herself between the two men. She told Fenstermaker to calm down because Randy was "just drunk." Fenstermaker was pointing the gun at her by now, "since [she] was right in front of him, kind of blocking Randy." Andrea said, "he would have to shoot [her] first," and Fenstermaker responded he would or that, "I will shoot you if I have to." Fenstermaker then shifted his gaze to Randy and told Andrea, "you better get your boy"—that is, do something about Randy.[7] Andrea turned to look at Randy, who was standing up and "started walking towards" them. Andrea tried to get Randy to sit back down by putting her hands on his shoulders. But Randy shoved her to the side, back into the kitchen. "Then [Fenstermaker] shot Randy" in the torso on the right side.

¶16 Andrea "heard Randy fall" and saw blood on the floor after Randy rolled over. She did not see Fenstermaker pull the trigger because she had been pushed and was facing away from both Fenstermaker and Randy. But she testified that she heard the gunshot "right after" or "very quickly" after she had been pushed, that it was "instantaneous."

¶17 Fenstermaker told a different story. He testified that after Randy threw Andrea out of the way, Randy reached back on the counter, where Fenstermaker believed he had left the knife he had used to poke holes in the beer cans. He also thought there might have been a fork there. He testified that Randy reached for the counter and "tried to come back to me." At that point, he fired one bullet which struck Randy in the lower abdomen on the right side. He claimed that he knew Randy had been violent with Andrea in the past and testified, "[I]f I didn't shoot my gun, I knew he wasn't going to let me leave. He told me multiple times he was going to

---

[7] "Your boy," in context, refers not to one of her children, but is a slang term for a "close male friend or companion." *Your boy*, REVERSO, https://dictionary.reverso.net/english-definition/your +boy (last visited Mar. 9, 2026) (sense 3).

kill me." The wound evidence proved that Randy was "sideways" to the gun—not facing Fenstermaker—when he was shot. After the shooting, Fenstermaker went out the front door. But he returned after taking a couple of steps and said, "You should have got your boy," and then left. Paramedics arrived and transported Randy to the hospital, where he died.

¶18 A short time later, Fenstermaker sent Andrea another Snap: "I was never at your house. He had a knife. I left."

¶19 There was no physical evidence of a knife anywhere near Randy when he was shot. Andrea did not see Randy with a knife or any other weapon, and testified that she put the knife used to shotgun beer back into the sink. Fenstermaker also admitted that he was "not sure if [Randy] had a knife in his hand" when he shot him, but he believed a knife was still on the counter. The police officers testified they found Randy lying on the floor in the open kitchen area, and that they did not see a knife or any other weapon in the area where Randy was lying. Photos of the crime scene (of which there were many) and police body camera footage (of which there was an hour's worth) showed no knife or any other utensils anywhere near Randy.

¶20 After leaving Andrea's house, Fenstermaker called his friend to pick him up, and the friend said Fenstermaker was calm and did not mention the shooting. The friend dropped Fenstermaker off at Fenstermaker's girlfriend's house, and Fenstermaker did not say anything to her either. The girlfriend testified he seemed "frustrated," but the only information she heard was from overhearing a phone conversation between Fenstermaker and his mother the next morning, which contained no mention of a knife or Randy's threats. Fenstermaker's mother came and picked him up from his girlfriend's apartment that morning. When he entered her car, he said, "I fucked up." Fenstermaker then spoke on the phone with his friend, telling him that he and Randy slap-boxed, "it got heated," he tried to leave, "Randy came at him," and then he shot Randy. But Fenstermaker did not tell his friend that Randy threatened to kill him or that Randy had a knife. He did not tell his mother that Randy threatened him or that he had a knife either.

¶21 Fenstermaker's mother drove him to the police station where he was arrested and interviewed—about fourteen hours after he fled Andrea's house. Around this time, police drew Fenstermaker's blood. *See supra* ¶ 8 n.4. Fenstermaker told the

officers that Randy had been aggressive, had hit him three times, and had turned to grab something off the counter after throwing Andrea out of the way, which Fenstermaker thought was a knife or maybe a fork. But Fenstermaker had a prior conviction for lying to police.

¶22 Fenstermaker was charged with murder (for shooting Randy), aggravated assault (for pointing the gun at Andrea), and possession or use of a firearm by a Category II restricted person (for having a gun while under the influence of marijuana), all felonies. Fenstermaker claimed to have acted in self-defense.

¶23 As noted, the issues in this case center on a jury instruction affecting Fenstermaker's self-defense claim. The State proposed an instruction that the jury could not consider self-defense on the murder charge if it found that Fenstermaker was "attempting to commit, committing, or fleeing after the commission or attempted commission of a felony"—either the aggravated assault or the firearm possession. *See* UTAH CODE § 76-2-402(2)(a)(ii) (2015).

¶24 Fenstermaker objected to this instruction, arguing that to avoid absurd results and concerns about the state constitutional right to self-defense, the statute should be read to disqualify self-defense only if the individual is "attempting to commit, committing, or fleeing after the commission or attempted commission of a *forcible* felony."

¶25 The district court rejected these arguments, citing the plain language of the statute (that "felony" meant "felony" and not "forcible felony") and otherwise ruling that Fenstermaker had failed to show that the statute was unconstitutional. It instructed the jury consistent with the statutory language of the time, including that self-defense was not an option if the defendant was committing a felony. The jury instruction stated:

> A person is not justified in using force under the circumstances described in the previous jury instructions if the person:
>
> (i) initially provokes the use of force against the person with the intent to use force as an excuse to inflict bodily harm upon the assailant; or
>
> (ii) was attempting to commit, committing, or fleeing after the commission or attempted commission of a felony; or

(iii)    was the aggressor or was engaged in a combat by
        agreement . . . .

Thus, if you find that the State proved any one of these three circumstances beyond a reasonable doubt, then you may not consider self-defense as a defense to Count 1 [the murder charge].

¶26    The jury convicted Fenstermaker of murder and of felony firearm possession but acquitted him of aggravated assault.

¶27    Fenstermaker appealed, raising the same forcible-felony and constitutional arguments. But rather than arguing that these alleged errors were prejudicial to him, his appellate counsel asserted that the erroneous self-defense instruction amounted to a structural error for which he did not need to prove prejudice. The court of appeals affirmed in a brief order because Fenstermaker had "not demonstrated how he was prejudiced by the alleged error in [the self-defense] jury instruction."

¶28    In postconviction proceedings, Fenstermaker raised similar arguments, arguing that his counsel was ineffective for various reasons related to the self-defense issue. The postconviction court disagreed, granting the State's motion for summary judgment and dismissing Fenstermaker's petition.

¶29    Fenstermaker appeals the postconviction court's rulings on two of the issues he raised below. First, Fenstermaker claims that his appellate counsel was ineffective for not arguing prejudice from the district court's refusal to interpret subsection 402(2)(a)(ii) to exclude only forcible felonies. The postconviction court assumed that appellate counsel performed deficiently but concluded there was no prejudice because the evidence against Fenstermaker was overwhelming and the evidence at trial did not provide a legal basis to assert self-defense.

¶30    Second, Fenstermaker claims that both his trial and appellate counsel were ineffective for not arguing that subsection 402(2)(a)(ii) created an absurd result unless there was a nexus between the felony disqualifying self-defense and the use of force. The postconviction court rejected this claim for three reasons. First, trial counsel did make this argument. Second, it was reasonable for both trial and appellate counsel to emphasize the forcible felony argument rather than the nexus argument. Third, Fenstermaker was not prejudiced because the evidence that he did not act in self-defense was overwhelming.

¶31    Fenstermaker timely appealed.

## STANDARD OF REVIEW

¶32    We review a postconviction court's ruling granting summary judgment for correctness. *Newton v. State*, 2025 UT 50, ¶ 30, 585 P.3d 1159. On ineffective-assistance claims, "we review a lower court's purely factual findings for clear error, but we review the application of the law to the facts for correctness." *State v. Ray*, 2020 UT 12, ¶ 23, 469 P.3d 871 (cleaned up).

## ANALYSIS

¶33    To establish constitutionally ineffective assistance of counsel, a defendant (or here, petitioner who was the defendant) must prove that (1) his counsel performed deficiently, and (2) he was prejudiced by the alleged deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because a defendant must show both deficient performance and prejudice, a reviewing court can resolve an ineffectiveness claim on either ground. *Id.* at 697. And where a court can more easily dispose of a claim for lack of prejudice, "that course should be followed." *Id.* We follow that course here. Because we hold that Fenstermaker was not prejudiced by his counsels' alleged errors, we affirm on that basis without examining deficient performance.

¶34    To establish prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).[8] In the

---

[8] Fenstermaker argues, citing language from this court's decision in *State v. Knight*, 734 P.2d 913, 920 (Utah 1987), that the *Strickland* standard falls at "some point substantially short" of "more probable than not." *Knight* addressed the prejudice standard under rule 30 of the Utah Rules of Criminal Procedure, which we have long interpreted using terms equivalent to the *Strickland* standard. *See State v. Fontana*, 680 P.2d 1042, 1048 (Utah 1984). But regardless of the rule 30 standard, the United States Supreme Court determines the Sixth Amendment standard, and as the State points out, *Harrington v. Richter* has since made clear that "the difference

(continued . . .)

context of an alleged error in a self-defense jury instruction, a "proper analysis . . . needs to focus on the evidence before the jury and whether the jury could reasonably have found that [defendant] acted in imperfect [or perfect] self-defense such that a failure to instruct the jury properly undermines confidence in the verdict." *State v. Garcia*, 2017 UT 53, ¶ 42, 424 P.3d 171.

¶35 Fenstermaker argues that there is a reasonable probability that a properly instructed jury (as he sees things) would have either acquitted him of murder based on self-defense or convicted him of manslaughter instead of murder based on imperfect self-defense. "Perfect self-defense is a complete defense to any crime, while imperfect self-defense is a partial defense, which reduces a charge of murder to manslaughter." *State v. Hogue*, 2025 UT App 88, ¶ 22, 572 P.3d 1147 (cleaned up). "[P]erfect self-defense and imperfect self-defense require the defendant to present the same evidence: that the defendant had a reasonable belief that force was necessary to defend himself." *State v. Low*, 2008 UT 58, ¶ 32, 192 P.3d 867; *see also* UTAH CODE § 76-2-402(1)(b) (2015) (perfect self-defense requires the defendant to present evidence that he "*reasonably believe[d]* that force [was] necessary to prevent death or serious bodily injury to the person . . . as a result of another person's imminent use of unlawful force" (emphasis added)); UTAH CODE § 76-5-203(4)(a) (2015) (imperfect self-defense requires the defendant to present evidence that he acted "under a *reasonable belief* that the circumstances provided a legal justification or excuse for the conduct although the conduct was not legally justifiable or excusable under the existing circumstances" (emphasis added)).

¶36 Both perfect and imperfect self-defense require that the defendant subjectively believe that deadly force was necessary, and that that belief be objectively reasonable. *See* UTAH CODE § 76-5-203(4)(b) (2015) (imperfect self-defense reasonableness "shall be determined from the viewpoint of a reasonable person under the then existing circumstances"); *State v. Sorbonne*, 2022 UT 5, ¶¶ 24, 28–29, 42, 506 P.3d 545 (explaining that the self-defense statute has "both a subjective and an objective component" for necessity).

¶37 The difference is that under perfect self-defense, the law justifies the use of force; for imperfect self-defense, the law does

---

between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case." 562 U.S. 86, 112 (2011) (cleaned up).

not. *See State v. Silva*, 2019 UT 36, ¶ 33, 456 P.3d 718; *see also Low*, 2008 UT 58, ¶ 32 (explaining that the difference between the two is whether the conduct was "legally justifiable or excusable under the existing circumstances" (cleaned up)).

¶38    Because Fenstermaker put on evidence that he acted in either perfect or imperfect self-defense, the State bore the burden of disproving beyond a reasonable doubt that he acted in self-defense. *See State v. Bonds*, 2023 UT 1, ¶¶ 38–40, 524 P.3d 581 (discussing the burden of proof for self-defense).

¶39    We conclude under the facts here that even if a jury had no instructional impediment to considering both perfect and imperfect self-defense, there is no reasonable likelihood of a more favorable result for Fenstermaker because the evidence to the contrary was overwhelming.

¶40    To believe that Fenstermaker both subjectively and reasonably believed that deadly force was necessary, the jury would have to believe him. The odds of that were low, for several reasons: (1) he pulled a gun on an unarmed man; (2) no physical evidence or other witness corroborated that Randy was reaching for or had a weapon; (3) he shot Randy in the side, when Randy would have been facing away from him rather than coming in his direction; (4) he fled the scene and was on the run for fourteen hours; (5) shortly after fleeing, he sent Andrea a lie ("I was never at your house") that he clearly intended that she pass on to police; (6) he had a prior conviction for lying to police; and (7) his account changed in significant ways in telling it to different audiences—his friend, his mother, police, and the jury.[9] Though there had been

---

[9] Fenstermaker did not tell others his version of the story immediately after the shooting. He told his friend "it got heated," he "tried to leave," "Randy came at [him]," and "that's when he shot him," but Fenstermaker did not say Randy threatened to kill him or that Randy had a knife. Similarly, to his mother he said, "I was leaving. I didn't want to kill him. I wanted to leave," but he did not tell her that Randy threatened to kill him or that Randy had a knife. His story was more complete in his police interview, where he told officers that Randy had grabbed "a knife or a fork" after throwing Andrea and turning to come at him. But Fenstermaker again left out the detail of Randy threatening to kill him.

(continued . . .)

some wrestling and slap-boxing earlier in the evening, it had been over for some time by then. And while Fenstermaker and Andrea agreed that Randy had made threats, the threats prompting Fenstermaker to draw his gun were interpreted in two different ways: Andrea understood them as future and conditional, and Fenstermaker saw at least some of them as immediate. But given the entire evidentiary picture, there is no reasonable likelihood that the jury would have believed Fenstermaker over Andrea. Thus, even if the jury had been instructed as Fenstermaker now claims, it would not have had a reasonable likelihood of making any difference.

## CONCLUSION

¶41 We affirm the post-conviction court. Fenstermaker has not carried his burden of proving a reasonable likelihood of a different result absent his counsels' alleged mistakes. Because he has not shown prejudice, his claims of ineffective assistance of counsel fail.

———————————

His intended pass-through lie to Andrea requires some unpacking. It read in whole: "I was never at your house. He had a knife. I left." The first part—that Fenstermaker was "never at [her] house"—was a lie by anyone's account, including Fenstermaker's. But even taking that lie on its face, it makes the last part—"I left"—somewhat confusing, since one cannot leave a place that one has never been. So Fenstermaker was either telling two different lies that Andrea could pick from (he wasn't there, or if he was, he left when Randy had a knife but before any violence), or he was telling a lie that needed some filling in ("I was never at your house [when things got violent]. He had a knife. [So] I left [before anything happened]."). Or perhaps it was a stream-of-consciousness attempt to workshop a good lie. But whatever the explanation, the presence of an obvious lie (his never being there) makes the on-the-heels assertion that Randy had a knife suspect, to say the least.